UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                          Case No:  26-12313-EPK
                                                Chapter 11, Subchapter V

IPIC THEATERS, LLC,

　　　　Debtor.

_____/

## DECLARATION OF JOSEPH J. LUZINSKI IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Joseph J. Luzinski, hereby declare under penalty of perjury:

1.　　　　I am a financial advisor ("Financial Advisor") to iPic Theaters, LLC, a debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 cases.

2.　　　　I have served as Financial Advisor to the Debtors since February 3, 2026. In such capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

3.　　　　I am above 18 years of age, and I am competent to testify.

4.　　　　I am a Senior Managing Director with Development Specialists, Inc. ("DSI"). DSI and its professionals are highly qualified and experienced in providing restructuring management and advisory services, including in the areas of insolvency, bankruptcy, reorganization, and corporate restructuring. For more than four decades, DSI has been providing well-respected restructuring management and advisory services, including corporate finance, turnaround consulting, forensic accounting, litigation support to distressed, insolvent, and reorganizing businesses, and supplying senior executives on an interim basis to financially troubled companies. DSI has specific and extensive experience in numerous and diverse sectors and its core competencies include providing management services and advising debtors in chapter 11 cases.

DSI maintains offices in various location in the United States, including Fort Lauderdale and New York, which are my two principal offices.

5. As a Senior Managing Director with DSI, I have advised and operated companies across a variety of industries and have served in various executive and fiduciary roles in numerous restructurings and bankruptcies. I have more than 37 years of experience in chapter 11 cases and in providing restructuring management services. My recent restructuring and bankruptcy experience includes serving as: (i) CRO to a merchant cash advance company in a chapter 11 case; (ii) CRO of a provider of hearing services and hearing aids in a chapter 11 case; (iii) the chapter 11 trustee to a pair of automotive dealerships; (iv) the chapter 7 trustee to a numismatic collector coin company; (v) advisor to the chapter 11 trustee to a Peruvian fishing company; (vi) CRO in a chapter 11 case to a law firm; (vii) the chapter 11 trustee for a shopping mall in Texas; (viii) the CRO to a bank holding company in a chapter 11 proceedings; and (ix) the liquidating trustee for one of the largest inpatient and outpatient behavioral healthcare services in the substance use disorder, addiction, and mental health treatment space in the United States.

6. On or about February 3, 2026, the Debtor retained DSI to provide the services of myself as Financial Advisor to the Debtor and additional staff to assist me in my role as Financial Advisor. Since the Debtors' retention of DSI, I and other colleagues from DSI that provide services for the Debtor have become familiar with the Debtor's business, financial affairs, debt structure, assets, contractual arrangements, operations, and strategic challenges. I and other colleagues at DSI have been assisting the Debtor with respect to managing liquidity, and analyzing potential strategic alternatives for the Debtor. Accordingly, I and other colleagues at DSI have acquired substantial background and information regarding the Debtor that will assist DSI in providing effective and efficient services to the Debtor with the many issues that may arise in the context of

these Chapter 11 Cases.

7.     I submit this declaration to assist this Court and parties in interest in understanding the circumstances leading to the commencement of this chapter 11 case, the capital structure of the Debtor, and the Debtor's prepetition restructuring efforts, and in support of: (a) the Debtor's petitions for relief under Chapter 11 Title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"); and (b) the emergency "first day" relief that the Debtor has requested from the Court pursuant to the motions and applications described herein.

8.     Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtor's management team and the Debtor's advisors, and my review of the relevant documents and information concerning the Debtor's operations, financial affairs, and refinancing and restructuring initiatives. If called upon to testify, I could and would testify competently to the facts set forth herein.

## Background

## I. The Debtors' History and Operations

9.     The Debtor is one of America's premier restaurant-and-movie theater brands and a pioneer of the dine in movie theater.   The Debtor's mission is to provide entertainment escapes, presenting high-quality, chef-driven culinary and mixology in architecturally unique destinations that include premium movie theaters and restaurants.

10.     The Debtor's predecessor filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware in 2019.  At the time, Debtor's predecessor indicated that increased competition and rising construction costs affected financial liquidity.[1]   Moreover,

---

[1] See Declaration of David M. Baker in Support of First Day Motions, *In re iPic-Gold Class Entertainment, LLC, et al.*, Case No. 19-11739-LSS (Bankr. Del. August 5, 2019) Docket No. 4.

the Debtor's predecessor's initial public offering failed to generate the capital sought while the company's public equity resulted in increased operating costs related to Securities and Exchange Commission's reporting and compliance requirements.  An affiliate of the Retirement Systems of Alabama, at the time a minority equity holder and lender to the Debtor, purchased the Assets of the Debtor out of that bankruptcy proceeding.  The Retirement Systems of Alabama currently owns 100% of the equity interests of the Debtor.

11.    The Debtor currently operates 13 locations in Florida, California, Georgia, New York, New Jersey, Texas, Washington and Maryland, which locations are leased.  As of the Petition Date, the Debtor employed approximately 1,300 full and part-time employees.  The Debtor is headquartered in Boca Raton, Florida.  Its offices are located at 433 Plaza Real, Suite 355, Boca Raton, FL  33432-3932, which the Debtor leases.

## IV. Events leading to Bankruptcy Filing

12.    Less than six months after the purchase of the Debtor's predecessor's assets out of bankruptcy, the Covid pandemic brought the movie theater industry to a screeching halt.  While movie theaters subsequently reopened, the audience levels and box office receipts have never recovered to the levels that existed prior to the Covid pandemic.  There are a variety of factors which have resulted in these depressed levels.  The number of theatrical releases by movie studios has dropped significantly since prior to the Covid pandemic.  Additionally, there is significantly increased competition for movie theaters from streaming services which enable consumers to watch a variety of entertainment options at home.

13.    The Debtor has approximate gross income of $112,500,000 in 2025 and through January 31, 2026 had approximate gross income of $12,900,000.  For the year ended December 31, 2025, the Debtor had a net loss of approximately $19,433,669.

V
## VI. The Debtors' Capital Structure and Primary Obligations

14.     The Debtor is aware of one UCC-1 financing statement filed by Konica Minolta Premier Finance with respect to a leased piece of equipment.  The Debtor is unaware of any other secured claims.

15.     Trade Debt. The Debtor estimates that it owes approximately $409,000 to vendors and other parties in trade debt as of the Petition Date.

16.     Taxes.  The Debtor estimates that it owes approximately $141,000 in taxes as of the Petition Date.

17.     Wages.  There is approximately $2.1 million in wages and benefits in arrears owed as of the Petition Date.

## VII. First Day Pleadings

18.     Concurrently with its chapter 11 petition, the Debtor is filing the following pleadings (collectively, the "First Day Pleadings"):

(a)     Emergency Motion Of Debtor For Entry Of An Order (i) Approving Continued Use Of Cash Management System; (ii) Authorizing Debtor To Open And Close Bank Accounts; (iii) Authorizing The Bank To Honor Certain Transfers; And (iv) Granting Related Relief ("Cash Management Motion");

(b)     Motion of the Debtors for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief (the "Tax Motion"):

(c)     Emergency Motion of  Debtor for Entry of an Order (I) Authorizing the Debtor to Pay Certain Prepetition Wages, Salaries, and Other Compensation, (II) Authorizing Continuation of Employee Benefit Programs, (III) Authorizing Banks to Honor and Process Checks and Transfers and Electronic Payments Requests Related to Such Employee Obligations, and (IV) Grant Related Relief (the "Wages Motion");

(d)     Motion of the Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by

Utility Companies and Requests for Adequate Assurance of Payment, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief (the "Utilities Motion");

(e)     Emergency Motion Of Debtor For Entry Of An Order (A) Authorizing, But Not Directing, Debtor To Pay Certain Prepetition Obligations To Critical Vendors; And (B) Granting Certain Related Relief (the "Critical Vendor Motion");

(f)     *Emergency* Motion Of Debtor For Entry Of An Order Authorizing The Debtor To (i) Continue Insurance Coverage Entered Into Prepetition And Satisfy Prepetition Obligations Related Thereto; And (ii) Honor The Terms Of Premium Financing Agreement And Pay Premiums Thereunder (the "Insurance Motion"); and

(g)     Debtor's Emergency Motion For Entry Of An Order (I) Authorizing The Debtor To Honor And Continue Certain Customer Programs And Customer Obligations, (Ii) Authorizing Banks To Honor And Process Check And Electronic Transfer Requests Related Thereto, And (iii) Granting Related Relief ("Customer Program Motion").

19.     The Debtor is also seeking to retain professionals, which applications are supported by separate declarations

20.     I am familiar with the contents of each First Day Pleading (including the exhibits to such motions) and believe the relief sought in each First Day Pleading will allow for an orderly transition of the Debtor into the Chapter 11 Case and is critical to maintaining operational stability and preserving the value of the estate as the Debtor and the confirmation of a Chapter 11 Plan. Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtor's estate and its stakeholders.

21.     As noted above, the relief sought in the various First Day Pleadings would allow the Debtor to, among other things, (i) obtain certain operational relief and establish various administrative procedures to promote a seamless transition into bankruptcy and (ii) obtain access to cash collateral in order to fund the Debtor's business operations and the administration of the

Chapter 11 Case.

22.    I have reviewed each of the First Day Pleadings or had their contents explained to me, and I believe the Debtor would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief sought in the First Day Pleadings will be critical to maintaining the stability of the Debtor's business operations, preserving value, and allowing the Debtor to focus its efforts confirmation of the plan and liquidation of the Debtor's assets.

## IX.    Tax Motion

23.    The  Debtor requests entry of an order (i) authorizing, but not directing, the Debtor to remit and pay (or use tax credits to offset) the Taxes and Fees (as defined below) in the ordinary course of business, without regard to whether such obligations accrued or arose before or after the Petition Date and (ii) granting related relief.  A summary of the Taxes and Fees for which the Debtor seeks authority to pay are set forth below:

| Category | Description | Outstanding as of Petition Date | Estimated Amount Due within Interim Period |
|---|---|---|---|
| Sales and Use Taxes | State taxes and obligations related to the sale of goods or services | $121,373.17 | $650,111.00 |
| New York City Commercial Rent | New York City rent taxes | $20,171.43 | $6,723.00 |
| | **TOTAL** | **$141,544.60** | **$656,834.00** |

25.    The Debtor collects, withholds, and incurs a variety of taxes and fees, including sales and use taxes and New York City commercial rent taxes. The Debtor remits the taxes and fees described in this Motion to various state and local governments and agencies, including taxing

and licensing authorities (collectively, the "Taxing Authorities").[2]

26.     Taxes and fees are remitted and paid by the Debtor through checks and electronic funds transfers that are processed through their banks and other financial institutions.

27.     The Debtor pays taxes and fees to the Taxing Authorities on a periodic basis, remitting them monthly, quarterly, semiannually or annually of each year, depending on the nature and incurrence of a particular tax or fee.

28.     The Debtor is obligated to pay state and local sales taxes in connection with its operations in Florida, Georgia, Maryland, Texas, New York, New Jersey, California, and Washington, on a monthly basis for the retail sale, consumption, rental or use of tangible personal property in the ordinary course of its operations (the "Sales Taxes"). The Debtor typically pays approximately $650,111.00 on average per month in Sales Taxes depending on the sales made in the month.

29.     The Debtor estimates that, as of the Petition Date, it has accrued approximately $121,373.17 in total Sales Taxes owed to various Taxing Authorities, including the New Jersey Division of Taxation ($93,638.86), Miami-Dade County Department of Regulatory & Economic Resources Business Division ($1,718.73), California Department of Taxation and Finance Administration ($1,002.45), and Department of Revenue of Washington State ($25,013.13). The Debtor estimates that an approximate $650,111.00 in Sales Taxes is expected to come due within the first 21 days following the Petition Date (the "Interim Period"). The Debtor requests authority, but not direction, to pay the Sales Taxes and to continue to pay such taxes as they become due and payable during the pendency of the Subchapter V Case.

---

[2]     The Debtor may have inadvertently omitted other taxing authorities. By this motion, the Debtor requests relief with respect to taxes and fees payable to all authorities, regardless of whether such authority has been identified herein.

30.     The Debtor is obligated to pay New York City commercial rent taxes in connection with its lease and occupancy of commercial premises used in the operation of its business in New York, New York (the "NY Rent Taxes," and together with the Sales Taxes, the "Taxes"). The Debtor typically pays approximately $20,171.00 per quarter, or approximately $6,723.00 per month, in NY Rent Taxes.

31.     The Debtor estimates that, as of the Petition Date, it has accrued approximately $20,171.43 in NY Rent Taxes that are owed to the City of New York, Department of Finance. The Debtor estimates that an approximate $6,723.00 in NY Rent Taxes is expected to come due within the Interim Period. The Debtor requests authority, but not direction, to pay the NY Rent Taxes and to continue to pay such taxes as they become due and payable during the pendency of the Subchapter V Case.

32.     In the ordinary course of the Debtor's operations, the Debtor is obligated to pay a variety of regulatory and licensing fees (each a "Fee," and collectively, the "Fees," and together with the Taxes, the "Taxes and Fees"). These Fees include annual report filing fees, which are required for the Debtor to conduct its businesses in Florida, Georgia, Maryland, Texas, New York, New Jersey, California, and Washington. Moreover, examples of regulatory and licensing fees paid by the Debtor include liquor licenses, food service permits, health department permits, business licenses, fire and safety permits, and other regulatory fees required to operate its theater, restaurant, and bar operations in Florida, Georgia, Maryland, Texas, New York, New Jersey, California, and Washington.

33.     To the best of Debtor's knowledge, no Fees are outstanding as of the Petition Date. However, in an abundance of caution, the Debtor requests authority to pay any Fees that may be owed as of the Petition Date, and to continue to pay such Fees as they become due in the ordinary

course of the Debtor's business.

## X.    Wages Motion

34.    As of the Petition Date, the Debtor employs approximately 1300 employees (collectively, the "Employees"), of which approximately 400 are full-time Employees, and 900 are part-time Employees.

35.    The Employees are integral to the Debtor's operations. They perform a wide variety of functions critical to the Debtor's ordinary course operations. The Debtor has designed its compensation programs to attract, retain, and motivate its employees. The efforts of these Employees will ensure a smooth transition into chapter 11 and help maximize of the value of the Debtor's estate.

36.    The Debtor maintains the following compensation and benefits programs and pays various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits Programs"):

37.    Employee Compensation;

38.    Payroll Processing Fees;

39.    Withholding Obligations;

40.    Health Programs;

41.    Life Insurance;

42.    Disability Insurance;

43.    Workers' Compensation Program;

44.    Reimbursable Expenses;

45.    Employee Discount;

46.    Non-Insider Severance Program; and

47.     Paid Leave.

48.     Upon information and belief, the vast majority of the Employees rely exclusively or primarily on the Employee Compensation and Benefit Programs to pay their daily living expenses and support themselves or their families. Thus, the Employees will face significant financial consequences if the Debtor cannot continue the Employee Compensation and Benefits Programs in the ordinary course of business during the pendency of the Subchapter V Case. The Debtor seeks to minimize the personal hardship that the Employees would suffer if employee obligations were not paid when due and, consequently, submits that the relief requested is necessary and appropriate.

49.     Further, any delay in payments to the Employees could cause the Debtor to lose the benefit of their services, which would jeopardize the Debtor's sale process, and lead to a rapid deterioration in the value of the business. Therefore, by this Motion, the Debtor requests authority to pay compensation due and outstanding as of the Petition Date on the terms set forth in the proposed order, and to maintain the Debtor's various employee benefit policies throughout this Subchapter V Case.

50.     Subject to the Court's approval, the Debtor intends to continue its Employee Compensation and Benefits Programs in the ordinary course, including honoring prepetition obligations due thereunder. The Debtor further requests confirmation of its right to modify, change, and discontinue any of its Employee Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course of business during this Subchapter V Case in its discretion and without the need for further Court approval, subject to: (a) other orders entered in this Subchapter V Case, (b) any agreements executed in contemplation of this Subchapter V Case, and (c) the requirements of the Bankruptcy Code.

51. Specifically, by this Motion, the Debtor seeks authority, but not direction, to pay or honor up to the following aggregate prepetition amounts on account of the Employee Compensation and Benefits Program:

| Prepetition Employee Obligations | Amount |
|---|---|
| Employee Compensation | $1,624,500 |
| Withholding Obligations and Payroll Taxes | $309,600 |
| Health Programs | $69,500 |
| Life Insurance and Disability | $5,345 |
| Workers' Compensation Programs | $63,465.84 |
| Paid Time Off | $89,000 |
| Reimbursable Expenses | $0 |
| Employee Discount | $0 |
| Non-Insider Severance Program | $0 |
| 52.   **Total** | **$2,161,410.84** |

53. The Debtor represents that only the Debtor's CEO, Patrick Quinn, is owed Employee Compensation that will exceed the statutory cap of $15,150 under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code ("Mr. Quinn"). The Debtor represents that Mr. Quinn's continued employment is critical to maintaining the operation of the Debtor during this Subchapter V Case. Accordingly, the Debtor seeks authority to pay Mr. Quinn the Employee Compensation owed on behalf of the pre-petition payroll, which is $15,823 in gross wages.

54. The Debtor pays Employees' wages, salaries, and other compensation bi-weekly, one week in arrears (collectively, the "Employee Compensation"). The final regularly scheduled payroll cycle prior to the Petition Date was for work ended on February 5, 2026, and was paid on

February 13, 2026. The next payroll date is for work ended on February 19, 2026, and is due to be paid on February 27, 2026. Because Employees are paid in arrears, virtually all Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date, and some Employees may be holding uncashed paper paychecks as of the Petition Date.

55.     Prior to the Petition Date, the Debtor paid the Employee Compensation for certain employees of IPIC Marketing, LLC ("IPIC Marketing"), which is a wholly owned subsidiary of the Debtor. IPIC Marketing currently has six employees. The Debtor respectfully requests that it be authorized to pay pre-petition Employee Compensation to IPIC Marketing Employees and continue to pay the Employee Compensation for the IPIC Marketing Employees post-petition.

56.     Prior to the Petition Date, the Debtor spent approximately $1,624,500 per pay period on Employee Compensation in the aggregate (inclusive of Withholding Obligations) (as defined below).[3]

57.     A vast majority of the Debtor's payroll is made by direct deposit through the electronic transfer of funds to the Employees' personal bank accounts. As of the Petition Date, the Debtor estimates that the amount of accrued but unpaid Employee Compensation is approximately $1,523,500 (inclusive of Withholding Obligations).[4]

58.     The Debtor utilizes the services of a third-party payroll processor ADP to process employment taxes, provide remittance services for the Employees and administer payroll and several other employee-related benefits programs. ADP charges the Debtor a monthly service fee (the "Payroll Processing Fees") based on the number of employees in a given payroll cycle. On a

---

[3] Of the $1,624,500, the Debtor's Employees are paid approximately $1,600,000, and IPIC Marketing employees are paid $24,500.

[4] The $1,523,500 is comprised of $1,500,000 of Employee Compensation for the Debtor's Employees, and $23,500 for IPIC Marketing employees.

monthly basis, the Debtor pays $7,600 Payroll Processing Fees. The Debtor seeks authority, but not direction, to pay these prepetition Payroll Processing Fees to ADP and to continue ADP's services post-petition in the ordinary course.

59.     During each applicable pay period, the Debtor, routinely deducts certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support and related fees, and pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"), and then ADP forwards such amounts to various third-party recipients. The Debtor estimates that as of the Petition Date, it holds (or has accrued an obligation to deduct from the upcoming Employee paychecks) approximately $6,000.

60.     In addition to the Deductions, federal and state laws require the Debtor to withhold certain amounts related to federal, state, and local income taxes, Medicare taxes, and Social Security (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authority. The Debtor must then match Employee Payroll Taxes and pay, from its own account, certain amounts for Social Security, Medicare taxes, federal and state unemployment insurance, and certain other taxes (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes"). The majority of Payroll Taxes are processed and forwarded to the appropriate federal, state, or local taxing authority within a few days of when Employees' payroll checks are disbursed, or on a monthly or quarterly basis in accordance with applicable state and local taxing authority requirements. Prior to the Petition Date, the Debtor paid approximately $303,600[5] per month in Payroll Taxes on average. As of the Petition

---

[5] The $303,600 is comprised of $300,000 Payroll Taxes for the Debtor's Employees; and $3,600 for IPIC Marketing employees.

Date, the Debtor does not believe it holds any unremitted Payroll Taxes.

61.     As of the Petition Date, the Debtor estimates that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $309,600. By this Motion, the Debtor seeks authority, but not direction, to pay or deduct in a manner consistent with historical practice any unpaid, prepetition Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of the Debtor's business on a post-petition basis.

62.     The Debtor offers several health and welfare benefit programs to salaried and/or exempt, along with full-time Employees (collectively, the "Eligible Employees"), including the Health Programs, the Insurance and Disability Programs, the Workers' Compensation Program, and the Retirement Plans, and pays certain administrative fees to third-party providers associated with such programs (each as defined herein, and collectively, the "Health and Welfare Programs"). For the avoidance of doubt, any and all administration costs on account of the Health and Welfare Programs include the monthly premium costs.

63.     The Debtor provides Eligible Employees and their eligible dependents with the opportunity to participate in a number of health benefit plans, including the Medical Plans, the Vision Plans, and the Dental Plans (each as defined herein, and collectively, the "Health Programs").

64.     The Debtor also subsidizes or continues to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), which is administered by Wageworks. Accordingly, the Debtor seeks authority, but not direction, to pay any unpaid prepetition amounts due under the Health Programs and to

continue the Health Programs in the ordinary course of business on a post-petition basis and consistent with prepetition practices.

65.     The Debtor offers medical and prescription drug benefit programs (the "Medical Plans") to Eligible Employees, for which the Debtor is level-funded. Eligible Employees can choose from four Medical Plans administered by Cigna, which have different premiums and coverage limits, and can choose to enroll a spouse and/or dependents. The Medical Plans offer a network of healthcare providers, and while Eligible Employees are free to choose their own healthcare providers, they generally obtain lower rates from "in-network" providers than from "out-of-network" providers. The medical coverage provided under the Medical Plan depends on a variety of factors, including, but not limited to, whether the coverage is sought for an individual or a family, or whether treatment is sought "in-network" or "out-of-network." Thus, monthly health care premiums per Employee may vary depending on the specific coverage under the Medical Plan in which the Employee is enrolled and whether the Employee has dependents also covered by the applicable plan. The Debtor is up to date in paying claims under the Medical Plans.

66.     The total cost of the Medical Plans is approximately $65,000 per bi-weekly pay period, of which approximately $20,000 is covered by Employee premiums and approximately $45,000 is paid by the Debtor. As of the Petition Date, the Debtor is holding premium contributions from employees on account of the Medical Plans.

67.     **Vision Plans**

68.     The Debtor also offers Eligible Employees the opportunity to participate in vision insurance plans administered by Cigna (the "Vision Plans"). The total cost of the Vision Plans is approximately $1,000 per bi-weekly pay period, of which approximately $500 is covered by Employee premiums and approximately $500 is paid by the Debtor. As of the Petition Date, the

Debtor is holding premium contributions from employees on account of the Vision Plans.

69.    **Dental Plans**

70.    The Debtor offers Employees the option of participating in dental insurance plans (the "Dental Plans") administered by Cigna. The total cost of the Dental Plans is approximately $3,500 per bi-weekly pay period, of which approximately $1,750 is covered by Employee premiums and approximately $1,750 is paid by the Debtor. As of the Petition Date, the Debtor is holding premium contributions from employees on account of the Medical Plans.

71.    **Insurance and Disability Programs**

72.    **Life Insurance Program**

73.    The Debtor provides certain Employees who are salaried and/or exempt basic and voluntary life insurance coverage (the "Basic Life Insurance") through Unum, with the option to enroll a spouse and/or dependents. The total cost of the Basic Life Insurance to the Debtor is approximately $2,500 per month. As of the Petition Date, the Debtor estimates that the amount of accrued but unpaid obligations on account of the Basic Life Insurance is approximately $0.

74.    **Disability Benefits**

75.    The Debtor provides Employees who are either salaried and/or exempt with short- and long-term disability benefits (the "Disability Benefits" and, together with the Basic Life Insurance, the "Life Insurance and Disability Programs") administered by Unum. The Debtor pays one hundred percent of short-term disability benefits. Employees pay for long-term disability benefits.

76.    Currently, eighty-nine Employees receive long-term disability benefits and one-hundred thirty-one Employees receive short-term disability benefits. The total cost of the short-term disability benefits to the Debtor is approximately $2,845 per month. The Debtor seeks

authority, but not direction, to pay all prepetition amounts due under the Life Insurance and Disability Programs and to continue the Disability Benefits on a post-petition basis in the ordinary course of business.

77.     The Debtor maintains workers' compensation insurance for its Employees (or is otherwise self-insured) at the statutorily required level for each U.S. state in which the Debtor has Employees (collectively, the "Workers' Compensation Program"). The Debtor maintains coverage for the Workers' Compensation Program through Travelers Property Casualty Company of America ("Travelers"). Travelers administers the Workers' Compensation Program in the United States and ensures the Debtor is in compliance with all applicable state laws.

78.     The Debtor pays an annual premium of $761,590 payable over a 12-month period. The premium is financed through AFCO. The next monthly payment is due February 28, 2026, in the amount of $63,465.84.

79.     By this Motion, the Debtor seeks authority, but not direction, to pay accrued but unpaid prepetition amounts related to the Workers' Compensation Program, continue and maintain the Workers' Compensation Program in the ordinary course of business, and modify the automatic stay to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable.

80.     The Debtor must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtor complies with applicable workers' compensation laws and requirements. As of the Petition Date, the Debtor does not believe that it has any amount of accrued and unpaid claims due on account of the Workers' Compensation Program.

81.     In the ordinary course of business, the Debtor provides paid leave to Employees in the form of Paid Leave (as defined below) in certain situations. In the ordinary course of business, the Debtor provides paid time off ("Paid Time Off") to salaried employees, and full-time hourly supervisors and corporate staff (non-exempt) employees. Salaried and/or exempt Employees are entitled to flexible Paid Time Off. For full-time hourly supervisors and full-time hourly corporate staff, Paid Time Off is front-loaded, and these Employees receive eighty (80) hours at the beginning of every calendar year. As of the Petition Date, the Debtor estimates that approximately $89,000 in Paid Time Off (the "Paid Time Off Obligations") has accrued but has not been used by Employees. By this Motion, the Debtor seeks authority, but not direction, to continue the Paid Time Off policies in the ordinary course, and any other Paid Time Off Obligations that come due in the ordinary course. For the avoidance of doubt, the Debtor does not seek to pay any Paid Time Off which would, in combination with Employee Compensation and any other payments to Employees described herein, result in payment to any Employee in excess of the $15,150 priority cap imposed by section 507(a)(4) of the Bankruptcy Code pursuant to the Order, except for Mr. Quinn, unless otherwise required by applicable state law.

82.     The Debtor believes that the continuation of the Paid Time Off policies in accordance with prior practice is essential to maintaining Employee morale during the Subchapter V Case. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtor anticipates that its Employees will utilize any accrued Paid Time Off in the ordinary course of business, which will not create any material cash flow obligations beyond the Debtor's regular payroll obligations.

83.     The Debtor reimburses certain Employees for certain expenses incurred in the scope of their duties (the "Reimbursable Expenses"). Reimbursable Expenses are typically

associated with travel, transportation, lodging, and meals incurred in connection with business travel, and certain other work-related expenses when a company credit card was not used by the Employee. By this Motion, the Debtor seeks authority, but not direction, to continue and pay amounts relating to Reimbursable Expenses, including unpaid amounts owed on account of Reimbursable Expenses incurred through Employees' personal funds.

84.     In the ordinary course of business, Employees submit their Reimbursable Expenses using a company generated expense report form with receipts attached, These reports are approved by the Employee's direct manager. The Debtor then processes reimbursement requests and pay the Employee for approved expenses. These reports are submitted to HR and are paid along with payroll.

85.     As of the Petition Date, the Debtor estimates that the aggregate amount of accrued but unpaid amounts owed to Employees on account of Reimbursable Expenses is $0.

86.     Active Employees are entitled to a 50% percent discount off all dining food and beverage (the "Employee Discount"). The Employee Discount is taken at the point of sale, so the Debtor is not liable for any amounts on account of the Employee Discount. The Debtor will suspend the Employee Discount at a certain point in the store liquidation process. The Debtor requests the authority, but not direction, to continue the Employee Discount in the ordinary course of business until the Employee Discount is suspended.

## XI.    Utilities Motion

87.     Through the Utilities Motion, the Debtor seeks the entry of order, (a) approving the Debtor's proposed form of adequate assurance of post-petition payments to the Utility Companies of a deposit equal to the Debtor's estimated aggregate of two weeks of utility expenses for each Utility Company based on the Debtor's average monthly payments over the last six-month period

prior to the Petition Date (the "Estimated Monthly Utility Expense"), less any deposit then held by such Utility Company (the "Adequate Assurance Deposit"); (b) approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance (as defined below); and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against the Debtor solely on the basis of the commencement of this Subchapter V Case, a debt that is owed by the Debtor for services rendered prior to the Petition Date, or on account of any perceived inadequacy of the Debtor's Proposed Adequate Assurance pending entry of the Order; and (d) setting a final hearing on this Motion.

88.     The Debtor fully intends to pay all undisputed post-petition obligations owed to the Utility Companies in a timely manner. The Debtor anticipates that the cash flow from operations and the cash on hand will be sufficient to pay all post-petition obligations to the Utility Companies. Thus, the Utility Companies' risk of non-payment during the pendency of this Subchapter V Case has been minimized, if not eliminated.

89.     The Debtor submits that the availability of a prepetition deposit or bond, (*i.e.*, the Adequate Assurance Deposit) for any requesting Utility Company, together with the Debtor's ability to pay for future Utility Services during this Subchapter V Case in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitute adequate assurance of payment to the Utility Companies for purposes of section 366 of the Bankruptcy Code.

90.     No creditor of any of the Debtor shall have any interest in or lien on the Adequate Assurance Deposit.

91.     Currently, approximately five (5) of the Utility Companies hold a security deposit or bond. The Debtor submits that such parties are already adequately protected and are requesting

that it not be required to provide an Adequate Assurance Deposit to any Utility Companies that hold security deposits in excess of an Adequate Assurance Deposit.

92. The Debtor proposes that any Adequate Assurance Deposits be maintained until the earlier of (a) entry of an order of the Court authorizing or directing the return of the Adequate Assurance Deposits to the Debtor; (b) entry of an order authorizing the sale of the Debtor's property where the Utility Company provides services; or (c) the effective date of any plan in the Debtor's case.

93. Considering the severe consequences to the Debtor of any interruption in services by the Utility Companies, but recognizing the right of the Utility Companies to evaluate the Proposed Adequate Assurance on a case-by-case basis, the Debtor proposes that the Court enter an Interim Order that approves and adopts the procedures set forth in the Utility Motion (the "Adequate Assurance Procedures").

94. The Debtor believes it is prudent to require Utility Companies to raise any objections to the Adequate Assurance Procedures so that such objections may be heard by the Court prior to the expiration of the 30-day period following the Petition Date contemplated in section 366 of the Bankruptcy Code

95. It is possible that, despite the Debtor's diligent efforts, certain Utility Companies have not yet been identified by the Debtor or included on the Utility Service List (each, an "Additional Utility Company" and, collectively, the "Additional Utility Companies"). Thus, promptly upon the discovery of an Additional Utility Company, the Debtor will provide a notice to such Additional Utility Company of the Adequate Assurance Procedures, including that there is an Adequate Assurance Deposit available upon their request. In addition, the Debtor requests

that the Court provide that the Additional Utility Companies are subject to the terms of the Interim Order and any Final Order, including the Adequate Assurance Procedures.

96.     The Debtor submits that the relief requested in this Motion strikes a fair balance between protecting the rights of the Utility Companies, the rights of the Debtor under the Bankruptcy Code and the need for the Debtor to continue to receive, for the benefit of its estate, the Utility Services upon which its business depends. The Debtor does not believe that the Utility Companies will be prejudiced by the Proposed Adequate Assurance, the requirement to provide the Debtor with uninterrupted access to Utility Services, or the procedures for resolving objections to the Proposed Adequate Assurance.

## XIII.   Insurance Motion

97.     In the ordinary course of business, the Debtor maintains approximately thirteen (13) insurance policies (collectively, the "Insurance Policies," and each individually an "Insurance Policy") that are administered by various third-party insurance carriers (collectively, the "Insurance Carriers"). The Insurance Policies provide coverage for, among other things, the Debtor's property, general & liquor liability, D&O liability, workers compensation, and commercial umbrella coverage. These Insurance Policies are essential to the ongoing operation of the Debtor's business. The Debtor's annual aggregate premium, TRIA, and surcharge payments (including taxes and fees) for the Insurance Policies is approximately $3,413,143.90, with approximately $2,928,298.00 financed or invoiced in installments, and approximately $327,049.72 paid per month.

98.     A list of the Debtor's insured property locations is attached as hereto as **Exhibit B**. A list of the Debtor's active Insurance Policies, with insurance company name, coverage type,

policy number, estimated annual premium, effective date, and expiration date is attached hereto as

**Exhibit C**.[6] The Insurance Policies are more specifically described below:

a.   **Commercial Property:**

- *Hartford Fire Insurance Company:* The Debtor maintains commercial property insurance with a Total Insured Value ("<u>TIV</u>") of $273,084,584. The annual premium for this coverage is $1,160,782.00.

b.   **Excess Flood:** The Debtor maintains several Insurance Policies providing excess flood insurance in various layers. The TIV under these policies is $77,831,292.

- *Sutton Specialty Insurance Company; Palms Specialty Insurance Company Inc.; Lloyds of London:* The Debtor maintains excess flood insurance with $5 million of coverage excess of $5 million of underlying flood insurance or retained loss. The annual premium for this coverage is $100,000.00.

- *StarStone Specialty Insurance Company:* The Debtor maintains excess flood insurance with $2 million of coverage, representing a 50% participation in a $4 million excess insurance layer that attaches upon $1 million of underlying coverage. The annual premium for this coverage is $87,500.00.

- *AXIS Surplus Insurance Company:* The Debtor maintains excess flood insurance with $2 million of coverage, representing a 50% participation in a $4 million excess insurance layer that attaches upon $1 million of underlying coverage. The annual premium for this coverage is $82,500.00.

c.   **Excess Earthquake:** The Debtor maintains two (2) Insurance Policies providing excess earthquake insurance in various layers. The TIV under these policies is $56,694,480.

---

[6] In addition to the Insurance Policies listed on Exhibit C attached hereto, the Debtor maintains numerous insurance policies with respect to, among other things, employee health, dental, disability, and life insurance benefits, and workers' compensation. These programs are described, and relief is requested with respect to such programs, in the *Emergency Motion of Debtor for Entry of an Order (I) Authorizing Debtor to Pay Certain Prepetition Wages, Salaries, and Other Compensation, (II) Authorizing Continuation of Employee Benefit Programs, (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations, and (IV) Granting Related Relief* filed contemporaneously herewith.

- *Palomar Excess and Surplus Insurance Company*: The Debtor maintains excess earthquake insurance with 66.66% of a $15 million excess layer attaching above $5 million of underlying coverage. The annual premium for this coverage is $26,668.00.

- *Everest Indemnity Insurance Company*: The Debtor maintains excess earthquake insurance with 33.33% of a $15 million excess layer attaching above $5 million of underlying coverage. The annual premium for this coverage is $13,332.00.

d.  **Cyber Security Insurance:**

- *AIG Specialty Insurance Company:* The Debtor maintains cyber security insurance providing $3 million in coverage for each of the following coverages: security and privacy liability, event management, network interruption, cyber extortion, and media content liability. The annual premium for this coverage is $27,949.00.

e.  **Executive Risk Package (D&O, EPL, FIDU):**

- *Midvale Indemnity Company:* The Debtor maintains insurance coverage with limits of $5 million for directors and officers liability, $3 million for employment practices liability, and $3 million for fiduciary liability. The annual premium for this coverage is $151,955.00.

f.  **Crime Insurance:**

- *Hanover Insurance Company:* The Debtor maintains crime insurance coverage with limits of $1 million for each of the following coverages: fidelity, forgery or alteration, premises coverage, transit coverage, computer fraud, funds transfer fraud, credit, debit or charge card fraud, and money orders and counterfeit money; with additional sublimits of $100,000 for data restoration expenses, $25,000 for personal accounts protection, and $1,000 each for false pretenses fraud and investigative expenses. The annual premium for this coverage is $16,646.00.

g.  **Commercial Umbrella:**

- *Travelers Property Casualty Company of America:* The Debtor maintains commercial umbrella insurance providing $10 million in coverage. The annual premium, TRIA, and surcharges total $297,911.60, including taxes and fees.

h.  **General & Liquor Liability:**

- *The Charter Oak Fire Insurance Company:* The Debtor maintains general and liquor liability insurance providing $10 million in coverage. The annual premium, TRIA, and surcharges total $659,928.00, including taxes and fees.

i.   **Business Automobile Insurance:**

- *Phoenix Insurance Company:* The Debtor maintains business automobile insurance providing $1 million in coverage for any one accident. The annual premium, TRIA, and surcharges total $2,807.00, including taxes and fees.

99.    The premiums for nine (9) of the Insurance Policies are financed (collectively, the "Financed Policies") because it is not economically advantageous to pay the premiums on the Financed Policies, in full, on a lump-sum, quarterly, or monthly basis. The premiums are financed by AFCO Direct, a division of AFCO Credit/Acceptance Corporation ("AFCO"). The Financed Policies are: (1) the Midvale Indemnity Company policy (Executive Risk Package); (2) the Hanover Insurance Company policy (Crime Insurance); (3) the AIG Specialty Insurance Company policy (Cyber Security Liability); (4) the Hartford Fire Insurance Company policy (Property); (5) the Everest Indemnity Insurance Company policy (Earthquake); (6) the Palomar Excess and Surplus Insurance Company (Earthquake); (7) the AXIS Surplus Insurance Company (Flood); (8) the Starstone Specialty Insurance Company (Flood); and (9) the Palms Specialty Insurance Company, the Sutton Specialty Insurance Company, and the Lloyds of London policy (Flood). The Financed Policies were funded by AFCO pursuant to the following agreements and terms:

j.   *Premium Finance Agreement – Promissory Note* between AFCO (Creditor) and the Debtor (Insured/Borrower) dated September 30, 2025. The total aggregate premium amount paid under this agreement is $1,491,274.44, with $300,235.24

paid down, and $1,191,039.20 financed at 8.34% APR, paid in nine (9) monthly installments of $137,251.12, beginning on November 1, 2025, and payable through July 2026; and

k. *Premium Finance Agreement – Promissory Note* between AFCO (Creditor) and the Debtor (Insured/Borrower) dated November 21, 2025. The total aggregate premium amount paid under this agreement is $199,633.46, with $40,059.86 paid down, and $159,573.60 financed at 8.34% APR, paid in eight (8) monthly installments of $20,588.60, beginning on December 1, 2025, and payable through July 2026

(the foregoing Premium Finance Agreements together, the "Premium Finance Agreements").

100.    As of the Petition Date, the Debtor is current with respect to its obligations under the terms of the Premium Finance Agreements. The Debtor respectfully requests authority to pay any installment payments in connection with the Premium Finance Agreements that come due postpetition in the ordinary course of business.

101.    The Debtor makes monthly installment premium payments to Willis Towers Watson Southeast Inc. d/b/a Willis Towers Watson Southeast Insurance Services, Inc. ("Willis"), its broker and agent, with respect to the four (4) non-financed Insurance Policies (collectively, the "Non-Financed Policies") on or around the first day of each month in the amount of $169,210.00. The next monthly installment payment is due on or around March 1, 2026. The Debtor does not pay any brokerage fees directly to Willis. As of the Petition Date, the Debtor is current with respect to its obligations relating to the Non-Financed Policies. The Debtor respectfully requests authority to make any payments in connection with the Insurance Policies that come due postpetition in the ordinary course of business.

102.    The obligations under the Premium Finance Agreements are secured by, among other things, any and all unearned or return premiums and dividends that may become due under the Financed Policies, as more particularly described in the Premium Finance Agreements.

103.    If the Debtor is unable to continue honoring its obligations related to the Premium Finance Agreements, AFCO may seek relief from the automatic stay to terminate the Financed Policies to recoup its losses. The Debtor could then be required to obtain replacement insurance on an expedited basis and likely at significant cost to its estate. The Debtor likely would face great hardship if it were required to obtain replacement insurance and pay a lump-sum premium for the Financed Policies in advance. Even if the Financed Policies were not terminated, any interruption in the Debtor's payments could have a severe, adverse effect on the Debtor's ability to finance premiums for future policies.

104.    Continuation of the Debtor's Insurance Policies is essential to the preservation of the value of the Debtor's business and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtor's commercial activities. Accordingly, to ensure uninterrupted coverage, the Debtor requests authority to maintain its existing Insurance Policies, pay any prepetition obligations related thereto, and honor its obligations related to the Premium Finance Agreements.

105.    Pursuant to the Insurance Policies, the Debtor may be required to pay various deductibles or retention amounts (the "Insurance Deductibles") depending upon the type of claim and insurance policy involved. Under certain policies, the Insurance Carriers may pay claimants and then invoice the Debtor for any Insurance Deductible. In such situations, the Insurance Carriers may have prepetition claims against the Debtor. While the Debtor is not aware of any Insurance Deductibles that are due and owing as of the Petition Date, the Debtor seeks authority to honor

any amounts owed to the Insurance Carriers to ensure uninterrupted coverage under their Insurance Policies.

## XV.    Critical Vendor Motion

106.    Through this motion, the Debtor seeks entry of an order authorizing, but not requiring, it to pay, in the Debtor's sole discretion, through reasonable exercise of its business judgment, the prepetition claims of certain critical vendors that are essential to the uninterrupted functioning of the Debtor's business operations (the "Critical Vendors," whose prepetition claims shall be identified as the "Critical Vendor Claims"), which shall not exceed $300,000.00 in the aggregate.  The Debtor's ability to continue to generate revenue on an uninterrupted basis and operate its business, and therefore, maximize the value of its estate during an orderly liquidation process, inextricably depends on goods and services provided by a variety of Critical Vendors

107.    The Debtor also seeks authorization for the applicable banks and financial institutions to process, honor, and pay any and all checks on account of pre-petition Critical Vendor Claims and to rely on the representations of the Debtor as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtor's instructions..

108.    Before filing this Motion, the Debtor, in consultation with its professionals, reviewed its accounts and undertook a process to identify those vendors truly essential to its operations. As part of its review, the Debtor determined that each Critical Vendor designated is absolutely critical—they are either a sole source of goods and services or an irreplaceable provider of the same. A disruption in the supply of goods and/or services provided by the Critical Vendors would likely result in immediate and irreparable harm to the Debtor's business and estate and

impair the orderly liquidation process. Such disruption would also increase costs and consume valuable time by forcing the Debtor to divert its resources to identify and establish alternative sources for the necessary goods and services.

## XVIII. Cash Management Motion

109.    Below is a brief discussion of the Debtor's Cash Management Motion and an explanation of why, in my belief, such motion is critical to the successful prosecution of the Chapter 11 Case.  More detailed descriptions of the facts regarding the Debtor's operations, and the bases for the relief requested in the Cash Management Motion, can be found in the Cash Management Motion.

110.    Specifically, the Debtor seeks entry of an Order, authorizing the Debtor to (a) continue to operate its Cash Management System as it was operated prior to the Petition Date, (b) maintain its Bank Accounts, (c) honor certain prepetition obligations related thereto, (d) allow the Debtor to print or stamp "Debtor-in-Possession" on its existing checks, and (e) waiving the requirements of section 345(b) of the Bankruptcy Code.

111.    The Cash Management System includes ten (10) Bank Accounts maintained at JPMorgan Chase & Co. (the "Bank").[7]  The Debtor is the account holder for all ten Bank Accounts.

112.    As of the Petition Date, in the ordinary course of business, the Debtor utilizes the Bank Accounts to manage deposits, make disbursements, including payroll, vendor payments and other operating payments, and to hold cash. The principal source of revenue for the Debtor is payments from its operation of thirteen movie theaters throughout the United States.

113.    The following is a more detailed description as to how the Cash Management

---

[7] Upon information and belief, the Bank is a well-capitalized, highly rated bank insured by the Federal Deposit Insurance Corporation and is a party to a Uniform Depository Agreement with the Office of the United States Trustee for Region 21 (the "U.S. Trustee").

System works:

114.    The Debtor has ten Bank Accounts, four of which are dormant Bank Accounts that are not used by the Debtor. These accounts include: xxxxx7598, xxxxx3039, xxxxx8991, and xxxxx3706.

115.    The Debtor's primary account is the Debtor's master operating account, Account No. xxxxx8249 (the "Master Operating Account"). All other Bank Accounts sweep to the Master Operating Account, except for the Account No. xxxxx8280 (the "Excess Cash Account"). The Master Operating Accounts funds all ACH, wire transfers, checks, and other transactions from the other Bank Accounts.

116.    The Excess Cash Account is used to hold funds from the Retirement Systems of Alabama (the "RSA"). Funds held in the Excess Cash Account are only used when needed.

117.    The Debtor's Cash Management System constitutes a customary and essential business practice, and it is similar to those commonly employed by entities of comparable size and complexity. The Cash Management System allows the Debtor to control and monitor corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balances and presentment information.

118.    As set forth in the First Day Declaration, the Debtor's continued use of these accounts is critical to a successful restructuring and a seamless transition to operation as a debtor in possession. Without continued use of these accounts, the Debtor could experience significant disruption in its cash receipts from customers, which would cause interruption of payments to vendors or employees, and other cash transactions that happen daily.

119.    The Debtor submits that any disruption caused to its Cash Management System

would cause irreparable harm to the Debtor's business and could interfere with the Debtor's ability to operate this Subchapter V Case.

120.    The Bank charges the Debtor ACH fees and monthly maintenance fees (collectively, the "Bank Fees"). The Debtor pays approximately $2,700 in Bank Fees on a monthly basis. In addition, the Debtor incurs a merchant fee of around 3.2% of every transaction every time a guest uses a credit card (the "Transaction Fees" and, together with the Bank Fees, the "Service Charges"). If the Debtor fails to pay the Service Charges, the Bank may refuse to continue working with the Debtor, which would cause immediate and possibly irreparable harm. Therefore, by this Motion, the Debtor requests authority to continue to pay the Service Charges and all other ordinary course fees and charges in accordance with any agreements governing the Bank Accounts, whether arising before or after the Petition Date, on the terms set forth in the proposed orders attached hereto.

121.    Additionally, the Debtor utilizes a credit card receipt management and expense reporting platform through Concur (the "Concur Platform"). The cost of this platform is approximately $4,374 per quarter. The Debtor also incurs gift card program fees for a platform that the Debtor previously utilized as these gift cards are still being redeemed (the "Gift Card Platform"). The fee associated with this program was approximately $1,450 for February 2026. The Debtor requests authority to continue to pay the Concur Platform, Gift Card Platform, and all other ordinary course fees and charges in accordance with any agreements governing the Concur Platform and Gift Card Platform, whether arising before or after the Petition Date, on the terms set forth in the proposed orders attached hereto.

122.    In the ordinary course of business, the Debtor uses its Business Forms to purchase goods and supplies from vendors and otherwise conduct business. The Debtor requests authority

to continue using the Business Forms without alteration, change, and a designation as a "Debtor in Possession" to avoid a significant and unwarranted expense. However, after the Debtor depletes its current Business Forms, the Debtor will replace such forms with those containing the "Debtor in Possession."  To the extent that the Debtor prints any new checks, it will include the designation "Debtor in Possession" and this case number.

### XIX.    Customer Program Motion

123.    The Debtor seeks entry of the Order, (a) authorizing the Debtor to honor certain prepetition obligations to the Debtor's customers and to otherwise continue the Customer Programs (defined below) in the ordinary course of business; (b) authorizing the Debtor's banks to honor and process check and electronic transfer requests related to the foregoing; and (c) granting related relief.

124.    Before the filing of this Subchapter V Case, the Debtor engaged in certain programs (the "Customer Programs"), in the ordinary course of business, to develop and sustain positive customer relationships, and engaged in certain practices to sustain efficient day-to-day operations. To support its sales efforts, the Debtor engaged in marketing and sales practices that were targeted to develop and sustain positive reputations for their services. The practices included accounting for various payments, cash and non-cash credits and honoring return policies and credits. Because the Customer Programs are an important component of the Debtor's operations and customer-retention strategy, continuing to honor the Customer Programs described below—including certain prepetition obligations arising thereunder—is necessary to maximize the value of the Debtor's estate for the benefit of all creditors and stakeholders in this Subchapter V Case.

125.    A significant majority of the obligations described above require cash payment including the Refund and Exchange Program, the Gift Card Program, and the Rewards Program

(each defined below).

126.    The Debtor maintains a refund and exchange program (the "Refund and Exchange Program") whereby the Debtor's customers may be able to obtain a refund or exchange for ticket purchases, subject to certain conditions.

127.    To accommodate their customers' needs, and consistent with industry practices, the Debtor has traditionally maintained Return or Exchange Policies with respect to both cash and credit purchases. These policies provide the Debtor's customers with comfort that they will be able to refund movie tickets as a situation arises in which a refund is needed. The Debtor requests authority to continue their practice of honoring returns and providing credits pursuant to the Refund and Exchange Program when and as necessary.

128.    The Debtor sells gift cards in any denomination. They may be redeemed for merchandise or services at any of the Debtor's locations, subject to certain conditions. The gift cards do not expire. The gift cards are an obligation of the Debtor to various customers on account of goods that were purchased by customers and returned prepetition. The Debtor requests authority to continue their practice of honoring Gift Cards when and as necessary.

129.    The Debtor maintains customer loyalty programs and subscriptions (the "Rewards Program"). The Debtor offers two tiers of an annual membership program. The first tier is Silver, which is complimentary and has no annual fee. The Debtor also offers a Gold membership, which has an annual fee of $39. Both tiers of rewards program earn members one IPIC ACCESS point for every one dollar spent. Members can redeem their IPIC ACCESS points at a value of 500 IPIC ACCESS points for $5 in credit towards qualifying purchases. IPIC ACCESS Points are earned on qualifying purchases. Qualifying purchases exclude alcoholic beverages in Georgia and Texas, along with tax, gratuities, gift card and membership purchases. As of January 31, 2026, there were

65,000,000 outstanding IPIC ACCESS points, however the terms and conditions of the program expressly state: *Points have no cash value and are not redeemable for cash, gift certificates, gift cards, or any cash equivalent. Accumulated Points and Rewards do not constitute property of any IAMRP Member and are not descendible, may not be inherited, bartered, purchased, transferred or sold to any third party.*

130.    The Debtor seeks the authority, but not the direction, to honor the Rewards Program if customers wish to redeem their points during the Subchapter V Case, which is consistent with the Debtor's prepetition practices.

## XX.    Emergency Relief

131.    As is typical for first day motions, the Debtors require expedited relief in order to ensure that it can timely meet its operating needs, including, without limitation, the next payroll that is due.

132.    The First Day Pleadings described above involve matters that require an emergency and expedited hearing and the Debtors are requesting that the Court, on an *ex parte* basis, schedule a hearing on the First Day Pleadings (the "First Day Hearing") as soon as the Court's schedule will permit and by, February 26, 2026.

133.    The relief requested in the Emergency Hearing Motion is necessary to obtain expedited relief on the First Day Pleadings. As described in detail in each of the First Day Pleadings, the expedited relief requested in the First Day Pleadings is essential to: (a) ensure a smooth transition into chapter 11; (b) maintain the Debtors' operations and business throughout the Chapter 11 Cases; (c) efficiently administer the bankruptcy cases; and (d) establish the basis

for the Debtors' restructuring efforts. Any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtors' operations and its transition into operating as a chapter 11 debtors in possession.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: February 25, 2026

/s/
Joseph J. Luzinski

*Proposed Financial Advisor for Debtor, IPIC Theaters, LLC*

**BURR & FORMAN LLP**

*/s/ Christopher R Thompson*
**Christopher R. Thompson**
Florida Bar No. 0093102
Primary Email: crthompson@burr.com
Secondary Email: mlucca-cruz@burr.com;
kkearney@burr.com

200 S. Orange Avenue, Suite 800
Orlando, FL 32801
Telephone: (407) 540-6600
Facsimile: (407) 540-6601

-and-

**Derek Meek** (*pro hac vice* application pending)
Alabama Bar No. ASB-7723-M74D
Primary Email: dmeek@burr.com
**Marc Solomon** (*pro hac vice* application pending)
Alabama Bar No. ASB-7382-M56S
Primary Email: msolomon@burr.com
Secondary Emails: mgunnells@burr.com;
ksickles@burr.com
420 North 20th Street, Suite 3400
Birmingham, AL 35203
Telephone: (205) 251-3000

56180481 v4
65945305 v1

Facsimile: (205) 458-5100

*Proposed Counsel for Debtor, IPIC Theaters, LLC*